**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| JOHN DOE, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | No. 2:17-cv-02793-TLP-cgc |
| v. | ) ) | JURY DEMAND |
| BLUECROSS BLUESHIELD OF TENNESSEE, INC., | ) ) ) | CLASS ACTION COMPLAINT |
| Defendant. | ) ) | |

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS**

Defendant BlueCross BlueShield of Tennessee ("Defendant" or "BCBST") moves to

dismiss Plaintiff John Doe's ("Plaintiff" or "Doe") First Amended Complaint ("Amended

Complaint," ECF No. 38), which he brings as a class action under Federal Rule of Civil

Procedure 23 on behalf of himself and all others similarly situated.[1]

The Amended Complaint asserts claims against Defendant for disability discrimination in

violation of § 1557 of the Patient Protection and Affordable Care Act ("§ 1557" of the "ACA")

(Count I), 42 U.S.C. § 18116, and Title III of the Americans with Disabilities Act of 1990, 42

U.S.C. § 12181, *et seq.*, as amended, ("Title III" of the "ADA") (Count II), breach of contract

---

[1] Defendant's Memorandum in Support of its Motion to Dismiss (ECF No. 40) focuses on the merits of Plaintiff's claims, as opposed to his requests for class relief. Plaintiff responded, (ECF No. 52), and Defendant filed a Reply. (ECF No. 60.)

(Count III), and unjust enrichment (Count IV).  Based on the following analysis, the Court GRANTS the Motion to Dismiss.

## **BACKGROUND**

The Court derives the following well-pleaded facts from the Amended Complaint and accepts them as true for ruling on the Motion to Dismiss.  Plaintiff is HIV-positive and is a retiree enrolled in a BCBST health plan through his former employer.  (ECF No. 38 at PageID 323.)  Until February 2017, Plaintiff obtained his HIV/AIDS medication, Genvoya ("HIV/AIDS medication," "medication," or "Genvoya") from his local community pharmacy in the Western District of Tennessee under his BCBST health plan (*Id.* at PageID 276, 323.)  In March 2017, Plaintiff's local pharmacy rejected his medication refill and informed him that his BCBST plan classifies his HIV/AIDS medication as a "specialty medication" and requires him to obtain his medication by mail-order.  (*Id.* at PageID 323.)  Over the next six months, Plaintiff contacted BCBST many times to discuss his options, including opting out of BCBST's specialty medication program (the "Program"), which, requires him to obtain his medicine by mail-order or through a designated specialty brick-and-mortar pharmacy ("B&M specialty pharmacy") in its network.  (*Id.* at PageID 324.)

Defendant defines "specialty medications" under the Program to "[i]nclude [ ] high-cost medication for chronic, serious, diseases such as hepatitis C, multiple sclerosis, arthritis, hemophilia and other conditions."  (*Id.* at PageID 286.)

Plaintiff requested the ability to opt out of the mail-order component of Defendant's Program.  BCBST's legal department told him that he could not do so.  (*Id.* at PageID 324.)  He appealed BCBST's decision to reject his formal request to opt out of the Program.  In a letter, BCBST denied his appeal request, stating that Genvoya "is a specialty drug and specialty drugs

are only covered if obtained through a pharmacy in your health plan's specialty pharmacy network, per the terms of your health benefits plan." (*See* ECF No. 38-1.) Plaintiff claims that this letter did not disclose that he could obtain his HIV/AIDS medication from a B&M specialty pharmacy. (ECF No. 38 at PageID 325.)

Plaintiff learned through his investigation of the B&M specialty pharmacies participating in Defendant's health plans that almost all of these pharmacies do not allow in-person pick-up, and, if they do, they are located great distances from Plaintiff's and other potential class members' residences. Even worse, the staff members at these B&M specialty pharmacies (or the BCBST employees who operate its customer service lines) are unfamiliar with Plaintiff's or class members' medical histories. And sometimes these B&M specialty pharmacies provide only a portion of the patient's medications, requiring patients to go to several locations to fill their prescriptions. (*Id.*)

Plaintiff asserts the number of these B&M specialty pharmacies is decreasing. Thus, Plaintiff alleges that the Program's requirements that he obtain specialty medications by mail or from a steadily decreasing number of B&M specialty pharmacies has an adverse, disproportionate effect on Plaintiff and other HIV/AIDS patients, compared to enrollees who have no disability or even to disabled enrollees prescribed non-HIV/AIDS specialty medications.

Plaintiff also focuses on the social stigma and discrimination associated with having HIV/AIDS and the potentially serious effect of missing a dose of HIV/AIDS medication. For example, the potential is high for heat damage to HIV/AIDS medications. Besides, says Plaintiff, HIV/AIDS patients have a heightened need for access to in-person consultations with community pharmacists who can notice potentially life-threatening side effects. (*See* ECF No. 38 at PageID 277–86.) Also, BCBST enrollees who have prescriptions for medications that

BCBST does *not* consider "specialty medications," including such HIV/AIDS patients who take medications for other health issues, may continue to obtain their prescriptions at a community pharmacy under their health plans without a penalty. Taking these allegations as true, according to Plaintiff, shows that BCBST's real motivation for the Program is profit and that it unlawfully discriminates against Plaintiff and potential class members. (*Id.* at PageID 275.)

As a result of BCBST's allegedly discriminatory behavior, HIV/AIDS patients like Plaintiff face this choice—either: (1) forego essential counseling from a community pharmacist and face privacy risks by obtaining their prescriptions through mail-order or B&M specialty pharmacies; or (2) they can pay thousands of dollars out-of-pocket to obtain their HIV/AIDS medications at a community pharmacy. (*Id.* at PageID 267–68.) Here, the BCBST Program requires Plaintiff to drive over two hours round trip to obtain his HIV/AIDS medication from an in-person pharmacist, causing him considerable stress and inconvenience. (*Id.* at PageID 276–77.)

Plaintiff filed the original class action Complaint. (ECF No. 1.) Defendant responded to the Complaint by moving to dismiss (ECF No. 33), and Plaintiff then filed the Amended Complaint. Defendant responded by moving again for dismissal. (ECF No. 39.)

## LEGAL STANDARD

To address a motion to dismiss, the Court's analysis starts with the Federal Rules of Civil Procedure. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claims showing that the pleader is entitled to relief." That said, under Rule 12(b)(6), a court can dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

4

on its face.'" *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see Engler v. Arnold*, 862 F.3d 571, 575 (6th Cir. 2017). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 662 (citation omitted). Yet the Court need not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Id.* at 678 (citing *Twombly*, 550 U.S. at 555).

Though a court will grant a motion to dismiss if a plaintiff has no plausible claim for relief, a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *DirecTV v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). So "[a] complaint should only be dismissed if it is clear to the court that 'no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Herhold v. Green Tree Serv., LLC*, 608 F. App'x 328, 331 (6th Cir. 2015) (quoting *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 855 (6th Cir. 2003)). And "[d]ismissal of the action is proper if there is an absence of law to support the type of claim made, if the facts alleged are insufficient to state a valid claim, or if, on the face of the complaint, there is an insurmountable bar to relief." *Doe v. Ohio*, No. 2:91-CV-464, 2012 WL 12985973, at *5 (S.D. Ohio Feb. 16, 2012) (citations omitted).

## ANALYSIS

### I.     Discrimination in Violation of the ACA

Plaintiff claims that the Program's disproportionate effect on him and other BCBST enrollees who suffer from HIV/AIDS violates § 1557 of the ACA. By contrast, Defendant argues that Plaintiff fails to state a viable claim under § 1557 of the ACA as enforced by Section 504 the Rehabilitation Act of 1973 ("Rehab Act"), 29 U.S.C. § 701, *et seq.* Section 1557 is the

ACA's antidiscrimination statute, which prohibits discrimination by any health plan on the basis of race, gender, age, or disability. This section uses the enforcement mechanisms under Title VI, Title IX, the ADEA, or Section 504 of the Rehab Act. The Rehab Act prohibits discrimination against an "otherwise qualified individual with a disability . . . solely by reason of her or his disability." 29 U.S.C. § 794(a). So Defendant argues that Plaintiff's ACA disability discrimination claim arises exclusively under the Rehab Act's enforcement framework. Under that framework, Defendant argues that Plaintiff fails to state a disparate treatment claim—a claim that Defendant intentionally discriminated against him because of his disability. And Defendant argues that disparate impact claims (allegedly neutral practices that have a disproportionate impact on particular persons) are not cognizable under the Rehab Act.

On the other hand, Plaintiff argues that Defendant's interpretation of § 1557 is impermissibly narrow and ignores comments from the Department of Health and Human Services Office for Civil Rights ("OCR") on regulations implementing § 1557. In essence, Plaintiff notes that "OCR interprets § 1557 as authorizing a private right of action for claims of disparate impact discrimination *on the basis of any of the criteria enumerated in the legislation*." Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31375-01, 31439–40 (May 18, 2016) (to be codified at 45 C.F.R. pt. 2) (emphasis added).[2] Thus, Plaintiff argues that the OCR's interpretation and the plain language of § 1557 mean that the statute incorporates the enforcement mechanisms of all the antidiscrimination statutes named in § 1557, including those

---

[2] OCR provided this interpretation in response to a comment requesting that OCR "clarify that all enforcement mechanisms available under the statutes listed in § 1557 are available to each Section 1557 plaintiff, regardless of the plaintiff's protected class." 81 Fed. Reg. 31440. The comment sought OCR's clarification because, "[f]or example, it would not make sense for a Section 1557 plaintiff claiming race discrimination to be barred from bringing a claim using a disparate impact theory but then allow a Section 1557 plaintiff alleging disability discrimination to do so." *Id.*

which allow disparate impact claims. *See Rumble v. Fairview Health Servs.*, No. 14-CV-2037 SRN/FLN, 2015 WL 1197415, at *11–12 (D. Minn. Mar. 16, 2015) (finding that "the language of Section 1557 is ambiguous" because it incorporates civil rights statutes that have different standards for liability, causation, and proof, and holding that Congress "likely intended that the same standard and burden of proof apply to a § 1557 plaintiff, regardless of the plaintiff's protected class status").

A discrimination claim under Section 504 of the Rehab Act requires a plaintiff to show: "(1) the plaintiff is a 'handicapped' person under the [Rehab] Act; (2) the plaintiff is otherwise qualified for participation in the program at issue; (3) the plaintiff is 'excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely by reason of his handicap;' and (4) the relevant program or activity is receiving Federal financial assistance." *Hill v. Bradley Cty. Bd. of Educ.*, 295 F. App'x 740, 742 (6th Cir. 2008) (quoting *Maddox v. U. of Tennessee*, 62 F.3d 843, 846 (6th Cir. 1995), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 314 (6th Cir. 2012) (en banc)) (brackets, quotation marks, and citations omitted). The parties do not dispute the first, second, or fourth elements, and Plaintiff's allegations focus on the third.

**A.     Disparate Treatment Claim**

The Court begins its analysis with the disparate treatment claim. To state a claim for disparate treatment under Section 504 of the Rehab Act, a plaintiff must allege that the defendant acted intentionally, i.e., that the defendant engaged in discriminatory conduct intentionally, or "solely by reason of [the plaintiff's] disability." *See* 29 U.S.C. § 794(a); *Doe v. Salvation Army in U.S.*, 685 F.3d 564, 567 (6th Cir. 2012). Plaintiff argues that Paragraph 50 of the Amended Complaint sufficiently alleges discriminatory intent. But the Court finds that it does not because

Paragraph 50 merely lists various conditions illnesses, many of which qualify as disabilities under the ADA, and which medications for those conditions that BCBST classifies as "specialty medications" under the Program. (ECF No. 38 at PageID 286–317.) And BCBST's list of medications designated as "specialty medications" under the Program also includes medications for conditions that are not designated—and likely would not be considered—as disabilities under the ADA or the Rehab Act, such as high cholesterol or allergic rhinitis, which Plaintiff admits is more commonly known as a "runny nose." (ECF No. 52 at PageID 523 n.3.) Reading Paragraphs 50 and 51 of the Amended Complaint together form Plaintiff's argument that Defendant's motivation for providing allegedly substandard services for disabled patients is profit rather than the fact that those patients are disabled. (*Id.* at PageID 317.)

With that in mind, Plaintiff argues that his allegations of BCBST intentionally discriminating against HIV/AIDS patients and being driven by profit are not mutually exclusive. Plaintiff asserts that his disability discrimination claim is valid under a "mixed motive" theory as seen in employment cases. *See Rios-Jimenez v. Principi*, 520 F.3d 31, 39 (1st Cir. 2008) (holding that district court correctly found that plaintiff was not entitled to mixed motive analysis because of her failure to present direct evidence of discrimination based on her disability). Under a mixed motive analysis, however, there still must be "direct evidence of discrimination." *See id.* This is because, unlike statutes like Title VII and the ADA, the Rehab Act includes the "solely because of" language, critical to the Court's analysis here. *See, e.g., Price Waterhouse v. Hopkins*, 490 U.S. 228, 241 (1989) (noting that under Title VII "because of" does not mean "*solely* because of" (emphasis in original)); *Jones v. Potter*, 488 F.3d 397, 409 (6th Cir. 2007) (holding that plaintiff's evidence could not prove that his disability constituted the "sole" reason

for his firing).  Likewise, the Court finds no such direct evidence of discrimination alleged in the Amended Complaint, so this is "not enough" under the Rehab Act.  *See Jones*, 488 F.3d at 409.

Additionally, the allegations in Paragraph 115 that Defendant's Program specifically targets individuals based on their disability, including HIV/AIDS, and affirmatively discriminates against them based on their disability, are conclusory and thus insufficient to state a claim for disparate treatment.  (*See id.* at PageID 334.)  So the Amended Complaint fails to state a prima facie claim that Defendant enacted the Program to discriminate against HIV/AIDS patients because of their disability.  The Court then turns to the issues of whether Plaintiff may pursue an ACA disability discrimination claim under a disparate impact theory and, if so, whether Plaintiff has made a prima facie disparate impact claim.

### B.    Disparate Impact Claim

The courts do not agree over whether Section 504 of the Rehab Act allows for disparate impact claims.  *See In re Express Scripts/Anthem ERISA Litig.*, 285 F. Supp. 3d 655, 687 (S.D.N.Y. 2018), *perm. app. filed,* (2d Cir. Feb. 5, 2018).  The Sixth Circuit seemingly does not recognize disparate impact claims under the Rehab Act, *see Crocker v. Runyon*, 207 F.3d 314, 321 (6th Cir. 2000).  In those jurisdictions which allow such claims, a plaintiff must prove "'(1) the occurrence of certain outwardly neutral practices, and (2) a *significantly adverse or disproportionate impact on persons of a particular type* produced by the defendant's facially neutral acts or practices.'"  *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016) (quoting *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 574–75 (2d Cir. 2003) (internal citations omitted) (emphasis added in original)).

Here Plaintiff's disparate impact claim asserts that the Program's requiring HIV/AIDS patients to obtain their HIV/AIDS medications by mail from a few B&M specialty pharmacies

effectively discriminates against Plaintiff and potential class members based on their status as being HIV/AIDS positive. (ECF No. 38 at PageID 266.)[3] Compared to nondisabled patients who received non-HIV/AIDS specialty medications, patients like Plaintiff suffer the social stigma and discrimination associated with being HIV/AIDS positive. Other disproportionately adverse effects include the potentially serious effect of missing a dose of HIV/AIDS medication, the potential for heat damage to HIV/AIDS medications, and HIV/AIDS patients have a heightened need for access to in-person consultations with community pharmacists who can notice potentially life-threatening side effects. (*See* ECF No. 38 at PageID 277–86.)

The parties disagree on two fronts whether Plaintiff may assert an ACA discrimination claim under a disparate impact theory. One, they disagree whether one or all the enforcement mechanisms of the civil rights statutes applies to Plaintiff's claim; two, they dispute whether disparate impact claims are available under the Rehab Act.

### 1.   Determining Which Enforcement Mechanism Applies

Plaintiff relies on the OCR's interpretation of § 1557 and the *Rumble* decision to support its argument that "Section 1557 thus incorporates the enforcement mechanisms of *all* of the named statutes." (ECF No. 52 at PageID 521 (emphasis added in original).) Thus, for example, because disparate impact claims are available under the other antidiscrimination statutes listed in § 1557, such as the ADEA or Title IX, Plaintiff argues that he can assert a disparate impact claim for disability discrimination under the Rehab Act. *See Rumble*, 2015 WL 1197415, at *11

---

[3] To be clear, Plaintiff acknowledges that Defendant technically offers members the ability to pick up their specialty medications at B&M specialty pharmacies, but Plaintiff contends that Defendant does not inform their members of this until they try to opt-out of the Program, and, without this notice, the Program is effectively a mandatory mail-order program. (*See id.*)

(determining that subjecting plaintiffs to different standards based on the type of discrimination action they bring would be "illogical").

Defendant counters that the plain language of § 1557 is unambiguous and that the enforcement mechanism of the Rehab Act "shall apply" as the sole theory under which Plaintiff may bring his disability discrimination claim under § 1557. Resolving this dispute begins with the statute's language.

Principles of statutory construction require the Court to determine whether the statutory text is plain and unambiguous and, if it is, the Court should apply the statute according to its terms. *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009) (collecting cases). The Court finds the language of § 1557 incorporating the enforcement mechanism of the separate civil rights statutes listed is plain and unambiguous. Congress thus intended "to import the various different standards and burdens of proof into a Section 1557 claim, depending upon the protected class at issue." *Se. Pennsylvania Transp. Auth. v. Gilead Scis., Inc.*, 102 F. Supp. 3d 688, 698 (E.D. Pa. 2015); *see also Briscoe v. Health Care Serv. Corp.*, 281 F. Supp. 3d 725 (N.D. Ill. 2017).

The *Briscoe* case is particularly instructive because the court issued its ruling after OCR published its interpretations of § 1557. There, the plaintiffs were mothers of newborn babies insured by Blue Cross and Blue Shield of Illinois ("BCBSIL"). They brought a class action against BCBSIL and a servicer of its health plans, claiming that defendants discriminated against them based on their sex violating § 1557 by providing disparate levels of health benefits and services for breastfeeding and lactating women. *Briscoe*, 281 F. Supp. 3d at 737. The court found that the plain language of § 1557 to be unambiguous and accorded the OCR interpretation no deference because "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of

Congress." *Id.* at 738 (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984)) (citation omitted). As a result of the court's analysis, it applied Title IX's enforcement mechanism to plaintiffs' § 1557 sex discrimination claim and determined that the claim failed because Title IX does not provide for claims premised on a disparate impact theory. *See id.* (string citation omitted).

Here, the Court similarly concludes that "[i]f Congress intended for a single standard to apply to all § 1557 discrimination claims, repeating the references to the civil-rights statutes and expressly incorporating their distinct enforcement mechanisms would have been a pointless (and confusing) exercise." *Id.* (citing *Gilead*, 102 F. Supp. 3d at 698). As in *Briscoe*, the Court analyzes Plaintiff's ACA disability discrimination claim under the Rehab Act's enforcement mechanism.

### 2. Whether the Rehab Act Allows Disparate Impact Claims

As mentioned, the Sixth Circuit addressed whether disparate impact claims are available under the Rehab and determined that "[t]here is good reason to believe that a disparate impact theory is not available[.]" *Crocker*, 207 F.3d at 321; *see also Rumberg v. Sec'y of the Army*, No. 10-11670, 2011 WL 1595067, at *11 (E.D. Mich. Apr. 27, 2011) ("Based on the language of *Crocker*, there is significant doubt, in this court's mind, as to whether a cause of action exists in the Sixth Circuit for disparate impact under the Rehabilitation Act."). Understandably, Defendant relies on *Crocker* and argues that, even if Plaintiff could bring a disparate impact claim, he has "pled *no facts* tending to show that BCBST's coverage for specialty medications 'has the effect of discriminating against a protected class of which [Plaintiff] is a member.'" (ECF No. 40 at PageID 362 (quoting *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 613 (6th Cir. 2012); citing *Tex. Dep't of Hous. & Cmty. Aff. v. Inclusive Communities Project, Inc.*, 135 S.

Ct. 2507, 252, 192 L. Ed. 2d 514 (2015) ("A plaintiff who fails to allege facts at the pleading state or produce statistical evidence . . . cannot make out a prima facie case of disparate impact.")).)

The *Crocker* case establishes that it is unlikely—at best—that a disparate impact claim exists under the Rehab Act in the Sixth Circuit. The Court recognizes that other jurisdictions have held that disparate impact claims are cognizable under the Rehab Act. *See, e.g., B.C.*, 837 F.3d at 158 (recognizing that a disparate impact claim exists under the ADA or the Rehab Act in a case involving disability discrimination in education); *see also Anderson v. Duncan*, 20 F. Supp. 3d 42, 53 (D.D.C. 2013) (finding that disparate impact claims are cognizable under the Rehab Act through the ADA in the employment context, but that "analyzing Rehab Act claims premised on disparate impact is like unpacking a nesting doll"). Even so, the Sixth Circuit has a more restrictive view of the Rehab Act.

In fact, the Sixth Circuit, sitting en banc, engaged in a thorough discussion of the causation standards under the Rehab Act and the ADA and noted that "Congress has amended the Rehabilitation Act and the ADA several times, but the distinction between the causation standards used by the two laws persists." *Lewis*, 681 F.3 at 315. In *Lewis*, the Sixth Circuit abrogated what had become its standard of importing the "solely" test of the Rehab Act into ADA claims. *Id.* at 314–15. The court found that "[a]t no point, then or now, has the ADA used the 'solely' because of formulation found in the [Rehab] Act." *Id.* at 315. The court determined then that courts are left "with two laws with two distinct causation standards. One bars differential treatment 'solely by reason of' an individual's disability; the other bars differential treatment 'because of' the individual's disability. No matter the common history and shared goals of the two laws, they do not share the same text." *Id.* at 315–16. So the court cautioned

that whatever the reason for the difference between the Rehab Act and the ADA, courts cannot ignore the difference, and they must refrain from "'apply[ing] rules applicable under one statute to a different statute without care and critical examination.'" *Id.* at 316 (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009)).[4]

Although the *Lewis* case addressed the district court's jury instruction about the causation standard under the ADA, its discussion of the differences between the Rehab Act and the ADA is particularly instructive on whether the Rehab Act allows disparate impact claims—or whether this Court should import the enforcement mechanism of another statute into a disability discrimination claim under § 1557.

Plaintiff's citation of *Alexander v. Choate*, 469 U.S. 287 (1985) to support his argument that some disparate impact claims are cognizable under the Rehab Act is not particularly helpful to his cause. There, the Supreme Court "assum[ed] without deciding that the [Rehab Act] reaches at least some conduct that has an unjustifiable disparate impact upon the handicapped…." *Id.* at 299. But the Supreme Court also expressed concern that interpreting the Rehab Act "to reach all actions disparately affecting the handicapped is also troubling [because] the handicapped typically are not similarly situated to the nonhandicapped," and allowing all disparate impact claims under the Rehab Act could prove to be unmanageable. *Id.* at 298–99. While the Supreme Court has stated that "[b]oth disparate-treatment and disparate impact claims are cognizable under the ADA," *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003), it appears to this Court that such a framework is more appropriate in the employment discrimination context only. As discussed in the *Anderson* case, "[b]ecause the Rehab Act incorporates the

---

[4] The court "unanimous[ly] agree[d]" that the "sole-cause" test is inappropriate for determining causation under the ADA but the judges disagreed over the majority's adoption of a "but-for" standard.

ADA, which is comparable for purposes of disparate impact to Title VII . . . . [t]he analysis of a disparate impact claim under the Rehab Act requires a study of the ADA's interaction with Title VII." 20 F. Supp. 3d at 54.

Even if a disparate impact claim were available in the Sixth Circuit, Plaintiff fails to present allegations sufficient to state a prima facie case. Although Plaintiff has identified ways in which Defendant's Program for specialty medications adversely affects him and other HIV/AIDS patients, he has alleged no statistical evidence sufficient to show that Defendant's Program has a "significantly adverse or disproportionate impact" on a protected group—HIV/AIDS patients—as compared to an unprotected group—non-disabled enrollees in BCBST's Program—based on their disability. *See Crocker*, 207 F.3d at 321–22; *B.C.*, 837 F.3d at 158 (stating "plaintiffs are ordinarily required to include statistical evidence to show disparity in outcome between groups" (quotation marks and citation omitted)). What is more, Plaintiff's allegations should be supported by statistical evidence, but, at bottom, it must be "particularly compelling." *Hale v. Johnson*, 245 F. Supp. 3d 979, 988 (E.D. Tenn. 2017) (finding that plaintiff failed to make a prima facie showing of a disparate impact claim under the Rehab Act by failing to introduce statistical evidence). Although what is "particularly compelling" is not clearly defined, the court in *Hale* noted that the Sixth Circuit in *Crocker* rejected a disparate impact claim "on the basis of lackluster statistical evidence." *Id.* (citing *Crocker*, 207 F.3d at 321 (denying relief where "[t]he number of other disabled individuals hired . . . indicates no singling out of disabled applicants."); *Shollenbarger v. Planes Moving & Storage*, 297 F. App'x 483, 485 (6th Cir. 2008) (holding in a Title VII disparate impact claim that courts should be wary of "incomplete or inapplicable analyses, simplistic percentage comparisons, and small sample sizes")) (footnote omitted).

What the Court does find particularly compelling is BCBST's list of "specialty medications" under the Program. The list includes medications for conditions that are not disabilities under the ADA or the Rehab Act. Thus, BCBST plan enrollees who are not disabled yet take specialty medications subject to the Program must endure the same procedural and logistical hurdles that HIV/AIDS patients face. This is fatal to Plaintiff's claim because Plaintiff cannot allege that BCBST forces HIV/AIDS patients to obtain their medications under the Program on the basis of their disability. *Cf. Gilead*, F. Supp. 3d at 700.

The Supreme Court in *Alexander* stated that the purpose of the Section 504 of the Rehab Act is to provide a disabled person with "meaningful access to the benefit that the grantee offers." 469 U.S. at 301. As discussed by the First Circuit in *Ruskai v. Pistole*, the Supreme Court's assumption in *Alexander* that disparate impact claims could reach situations "in which persons with disabilities [are] denied meaningful access to a government program or benefit" does not mean that Defendant's policies "must be free from any unpleasant effects, such as dollar impact, waiting time, or lack of quality, unless those effects are fundamental or necessary to the Defendant's policies." *See Ruskai v. Pistole*, 775 F.3d 61, 78–79 (1st Cir. 2014) (holding that the effects described above, "neither connected to any denial of access nor motivated by discriminatory intent," are outside the scope of Section 504 as understood by the Supreme Court in *Alexander*). Although the Court understands the inconvenience facing that HIV/AIDS patients like Plaintiff as a result of Defendant's policy, interpreting Section 504 of the Rehab Act to reach the claims in the Amended Complaint would flout the Supreme Court's cautionary instructions in *Alexander*.

The Court's analysis and holding are not questioning the difficulty experienced by Plaintiff's and other patients with HIV/AIDS who obtain their medications through Defendant's

Program. The Court also recognizes that despite advances in education and medicine, being HIV/AIDS positive still carries a stigma. Those diagnosed with either condition face significant challenges, including the discrimination they encounter in many aspects of their daily lives. (*See* ECF No. 38 at PageID 269.) Perhaps the Program here makes that reality even more painful for Plaintiff. All the same, the Court finds that the Amended Complaint stops short of alleging that Plaintiff's insurer has completely deprived him of access to his HIV/AIDS medication. This is particularly compelling when considering whether Plaintiff has stated a claim for disparate impact under the Rehab Act.

For these reasons, the Court GRANTS Defendant's Motion to Dismiss, and Plaintiff's Count I of the Amended Complaint is DISMISSED WITH PREJUDICE.

## II.     Title III of the ADA

Plaintiff's second cause of action is that Defendant's allegedly discriminatory Program violates Title III of the ADA. This title provides,

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or *operates a place of public accommodation.*

42 U.S.C. §12182(a) (emphasis added). To state a claim for disability discrimination under Title III, a plaintiff must allege that: "(1) [he] is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) [the plaintiff] was denied public accommodations by the defendant because of [his] disability." *Day v. Sumner Reg'l Health Sys., Inc.*, No. 3:07-0595, 2007 WL 4570810, at *2 (M.D. Tenn. Dec. 26, 2007) (citing 42 U.S.C. §§ 12182(a)-(b)) (citations omitted).

The Amended Complaint alleges that the Program denies Plaintiff "full access to and enjoyment of community pharmacies," which are places of public accommodation under the

ADA. 42 U.S.C. § 12181(7)(F). Plaintiff argues that the terms of Plaintiff's policy with BCBST violates Title III of the ADA because BCBST effectively "operates" pharmacies by controlling enrollees' access to and enjoyment of community pharmacies through the terms of their health plans. (*See* ECF No. 52 at PageID 526.)

For this claim, Plaintiff asks the Court to adopt a definition of "operates" in Title III that is "a right to control the allegedly discriminatory conditions," and to hold that Defendant's control over pharmacies through the terms of Plaintiff's health plan is enough to state a Title III claim. *See Zamora-Quezada v. HealthTexas Med. Grp. of San Antonio*, 34 F. Supp. 2d 433, 439 (W.D. Tex. 1998). Yet to adopt Plaintiff's argument and to hold in his favor would require this Court to ignore binding authority from the Sixth Circuit that "a benefit plan offered by an employer is not a good offered by a place of public accommodation," and "Title III does not govern the content of a long-term disability policy offered by an employer." *Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1010–12 (6th Cir. 1997) (en banc), *cert. denied*, 522 U.S. 1084 (1998) (affirming district court judgment that "Title III only covers discrimination in the physical access to goods and services, not discrimination in the terms of insurance policies"); *see also Kolling v. Blue Cross & Blue Shield of Michigan*, 318 F.3d 715, 716 (6th Cir. 2003) ("A benefit plan offered by an employer, like those health care benefit plans covering the appellants in the present case, is not goods offered by a place of public accommodation.").

While Plaintiff suggests that *Parker* addressed the narrow question of whether the plaintiff there could assert a Title III claim against the plaintiff's employer, this Court does not read the opinion in such a limited fashion. Instead, the Sixth Circuit, sitting en banc, affirmatively held that Title III does not govern claims based on the content of an employer-provided insurance plan. *See Parker*, 121 F.3d at 1012. Plaintiff's case resembles the facts in

*Lenox v. Healthwise of Kentucky, Ltd.*, where the Sixth Circuit rejected the plaintiff's Title III

claim because she was "complaining about the mix of goods and services offered by an

insurance company. [The plaintiff's] complaint relat[es] solely to the fact that [the insurer's]

policy does not cover heart transplants but does cover other transplants." 149 F.3d 453, 457 (6th

Cir. 1998).

Here, as in *Lenox*, the essence of Plaintiff's Amended Complaint centers on the terms of

Defendant's specialty medication Program under his health insurance plan. That Plaintiff may

not use his plan benefits at a community pharmacy of his choosing to pay for his HIV/AIDS

medication fails to support a valid claim against his insurance provider under Title III of the

ADA. *See id.* (finding that the health plan "do not demonstrate any barrier to [plaintiff]

accessing [the insurer's] physical facility"). The "access" to the "public accommodation" is to

his health plan, not a pharmacy. *See Parker*, 121 F.3d at 1010–11 ("[T]he good that plaintiff

seeks is not offered by a place of public accommodation . . . . [Plaintiff] did not access her policy

from MetLife Insurance's office. Rather, she obtained her benefits through her employer.").

The Sixth Circuit's language in *Parker* suggests that there is no nexus between the disparity in

benefits under Plaintiff's health plan and the services offered by a community pharmacy. *See id.*

at 1011.

Viewing the Amended Complaint in the light most favorable to Plaintiff, the Court finds

persuasive Defendant's point that Plaintiff's ADA claim is based on the *terms* of BCBST's

coverage for specialty medications, not the *availability* of coverage for those medications—even

when the effect of those terms is that Plaintiff may not obtain his HIV/AIDS medication from a

community pharmacy without incurring exorbitant costs. Plaintiff is not complaining that he

cannot use a community pharmacy at all. At bottom, Plaintiff's complaint is that his health

insurance provider will not pay for one of his medications if he goes to his local pharmacy.

Thus, Plaintiff has no claim under Title III of the ADA, and Count II of the Amended Complaint is DISMISSED WITH PREJUDICE.[5]

## III.    Breach of Contract

Plaintiff ties his Breach of Contract claim to two primary documents—the BCBST Pharmacy Drug Program Rider ("Rider") and the July 27, 2017 letter from BCBST in which it upheld the denial of Plaintiff's request to opt out of the Program.  That letter, included page 94 of Plaintiff's health plan or "Evidence of Coverage" ("EOC") provides the Program:

> **Specialty Drugs –** You have a distinct network for Specialty Drugs:  the Specialty Pharmacy Network.  To receive benefits for self-administered Specialty Drugs, You must use a Specialty Pharmacy Network Provider.  Please refer to Your EOC for information on benefits for Provider-Administered Specialty Drugs.
>
> Specialty Drugs are limited up to a thirty (30) day supply per Prescription.

(ECF No. 38-1 at PageID 348.)  Page 94 of the EOC further provides that obtaining "Specialty Drugs" in the "Specialty Pharmacy Network" carries a $120 copay but it will not cover such drugs from outside that network.  (*Id.*)

Plaintiff's breach of contract claim is also based on an alleged violation of the Rider. Plaintiff alleges here that Defendant agreed to cover Plaintiff's prescription drugs, subject to a copay, so long as those drugs were (a) filled on or after Plaintiff's coverage began; (b) approved for use by the Food and Drug Administration ("FDA"); (c) dispensed by a licensed pharmacist or

---

[5] Defendant also moves to dismiss Plaintiff's ADA claim based on the ADA's "safe harbor" provision, which shields insurers and plan administrators from liability for "establishing, sponsoring, observing, or administering the terms of a bona fide benefit plan that are based on underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law." 42 U.S.C. § 12201(c).  The Court determines that it need not analyze the applicability of the ADA safe harbor provision given the analysis above but the Court agrees with Plaintiff that it would be premature at this stage to dismiss claims based on the safe harbor provision.  *See Zamora-Quezada*, 34 F. Supp. 2d at 444.

network physician; and (d) listed on BCBST's Preferred Formulary.  (ECF No. 38 at PageID 323.)

The Amended Complaint makes general allegations about breach of the Rider and Plaintiff's overall health plan.  For example, Plaintiff asserts that "[s]ince in or around February of 2017, pursuant to a unilateral change in coverage by Defendant, Plaintiff and similarly situated [c]lass [m]embers have been required by Defendant to obtain HIV/AIDS Medication through the Program," or that the Program as implemented "has violated Plaintiff's rights under his insurance plan and the rights of similarly situated Class Members to have their HIV/AIDS Medications covered."  (ECF No. 38 at PageID 338–39.)  He asserts that by unilaterally changing coverage for medications by implementing the Program, Defendant has breached the implied covenant of good faith and fair dealing by "frustrat[ing] or den[ying] [Plaintiff and putative class members] the benefits of their original bargain, charging them the same or higher costs for lesser benefits."  (*Id.* at PageID 339.)

By contrast, Defendant maintains that Count III should be dismissed because Plaintiff "fails to identify any contractual provision that BCBST purportedly breached," and because Plaintiff may not assert a standalone claim for breach of the implied covenant of good faith and fair dealing.  (ECF No. 40 at PageID 369.)

Defendant's points are well-taken.  The Amended Complaint fails to identify a specific provision of the health plan that Defendant has breached.  Essentially, Plaintiff argues that the coverage under his health plan with BCBST provides few options where he can go to refill his prescription for his HIV/AIDS medication.  Even so, there is nothing in the Amended Complaint suggesting that Defendant violated the terms of its contract with Plaintiff when it denied his request to fill his Genvoya prescription at his local community pharmacy.  The Court also finds

no inconsistent language between Page 94 of the EOC and the Rider, and the Court should read the contract's provisions in context with its entirety. *See, e.g., Cates v. Crystal Clear Techs., LLC*, 874 F.3d 530, 541 (6th Cir. 2017) (citing *D&E Constr. Co. v. Robert J. Denley Co.*, 38 S.W.3d 513, 519 (Tenn. 2001) (citation omitted)). Thus, Plaintiff fails to allege a viable claim for breach of contract.

Turning to Plaintiff's breach of the implied covenant of good faith and fair dealing claim, it is well established under Tennessee law that "[p]erformance of a contract according to its terms cannot be characterized as bad faith." *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 687 (Tenn. 1996). And "[t]he implied obligation of good faith and fair dealing does not . . . create new contractual rights or obligations, nor can it be used to circumvent or alter the specific terms of the parties' agreement." *Lamar Adver. Co. v. By-Pass Partners*, 313 S.W.3d 779, 791 (Tenn. Ct. App. 2009). A claim for breach of the implied covenant of good faith and fair dealing based on compliance with a contractual term and which fails to identify the precise term(s) that Defendant allegedly breached cannot survive because it would require the Court to rewrite Plaintiff's health plan. *See, e.g., Jackson v. CitiMortgage, Inc.*, No. W2016-00701-COA-R3-CV, 2017 WL 2365007 at *11 (Tenn. Ct. App. Jan. 18, 2017) ("To extend Citi's obligation under the duty of good faith and fair dealing to require it to undertake or complete a loan modification review and subsequently postpone a foreclosure sale explicitly provided for in the contract . . . would create additional contractual rights or obligations . . . and alter the terms of the agreement.") (internal citations and quotation marks omitted). Reading the contractual terms cited in the Amended Complaint in the light most favorable to Plaintiff, the Court still finds that Plaintiff has failed to state a claim for breach of contract. The Court finds that Plaintiff fails to

allege a plausible breach of contract claim, so, Count III of the Amended Complaint is DISMISSED WITH PREJUDICE.

## IV.    Unjust Enrichment

The Court now turns to the Amended Complaint's unjust enrichment claim. Unjust enrichment is a "quasi-contractual theory or is a contract implied-in-law in which a court may impose a contractual obligation where one does not exist." *Whitehaven Community Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998). Plaintiff pleads in the alternative that if the Court finds that there is no enforceable contract governing the claims at issue, Defendant has been unjustly enriched at the expense of Plaintiff and putative class members. (ECF No. 38 at PageID 340.)

Defendant responds with Tennessee's law on unjust enrichment, which applies "only when no express contract exists or a contract has become unenforceable or invalid." *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 154–55 (Tenn. 1966). And so Defendant argues that "when an express contract exists between the parties, there can be no claim for unjust enrichment." *Jack Tyler Eng. Co., Inc. v. TLV, Corp.*, No. 07-2580 STA-dkv, 2008 WL 2998840, at *1 (W.D. Tenn. July 31, 2008) (citing *Arena v. Schulman, LeRoy & Bennett*, 233 S.W.3d 809, 815 (Tenn. Ct. App. 2006)). Thus, Defendant asserts that Plaintiff here may not plead unjust enrichment alternatively. *See Daily v. Gusto Records, Inc.*, 14 F. App'x. 579, 587 (6th Cir. 2001) (citing *Jaffe v. Bolton*, 817 S.W.2d 19, 26 (Tenn. Ct. App. 1991)).

Even though a plaintiff may not recover for both breach of contract and unjust enrichment, the Federal Rules of Civil Procedure affirmatively allow plaintiffs to plead in the alternative, "regardless of consistency." Fed. R. Civ. P. 8(d)(3); *United Tel. Se., LLC v. Bristol Tenn. Essential Servs.*, No. 14-242, 2015 WL 13186245, at *3 (E.D. Tenn. Aug. 5, 2015). Here,

however, the parties admit that Plaintiff's BCBST health plan controls the relationship between the parties, and Plaintiff does not appear to contend that the health plan would not cover some aspect of Plaintiff's ability to obtain his HIV/AIDS medications. The Court also finds that the health plan is an enforceable contract controlling the parties' relationship, which means that, Plaintiff's unjust enrichment claim, even pleaded alternatively, necessarily fails. Thus, Count IV of the Amended Complaint is DISMISSED WITH PREJUDICE.

<u>**CONCLUSION**</u>

For these reasons, the Motion to Dismiss the Amended Complaint (ECF No. 39) is GRANTED as follows:

(1) Count I is DISMISSED WITH PREJUDICE;

(2) Count II is DISMISSED WITH PREJUDICE;

(3) Count III is DISMISSED WITH PREJUDICE; and

(4) Count IV is DISMISSED WITH PREJUDICE.

The Motion to Dismiss the original Complaint (ECF No. 33) is DENIED AS MOOT.

Plaintiff concluded his Response to the Motion to Dismiss by requesting that the Court grant him leave to amend if dismissing any of this claims.

Federal Rule of Civil Procedure 15(a)(2) provides that the Court should give leave to amend a pleading freely "when justice so requires." This leave is conditioned on the lack of "futility of amendment." *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Miller v. Champion Enters., Inc.*, 346 F.3d 660, 690 (6th Cir. 2003). An amendment is futile if it cannot withstand a Rule 12(b)(6) motion to dismiss. *Riverview Health Inst., LLC v. Medical Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010) (citing *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000)). As a result of the foregoing analysis dismissing all of Plaintiff's claims in the Amended Complaint with prejudice, the Court finds that an amendment here would

be futile.  Thus, the request for leave to file an amended complaint is DENIED.  Judgment will

be entered accordingly.

**SO ORDERED**, this 30th day of July, 2018.

s/ Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE